Good morning, your honors, and may it please the court. My name is Gil DeFord. I'm the counsel for plaintiff's appellants. This case challenges the Secretary of Health and Human Services' extreme interpretation of the Medicare statute and its legislative history, by which almost all the work done by a dentist, no matter how complex and necessary for the health of the patient, is not covered under Medicare. It runs directly contrary to the intent of Congress, which stated that the purpose of the statute was to cover, quote, complex surgical procedures, end quote, in the dental context. As a matter of fact, though, only a very few procedures are covered for which there is no consistency or coherent thread. Let me say, first off, we are not arguing to get rid of the exclusion of coverage for routine dental services. We accept that's part of the statute. What we're saying is that the Secretary has overextended that exclusion so that it virtually covers, it virtually excludes coverage of all situations involving oral surgery. The plaintiff's situations and the brief of the amicus, and that's an important brief to read, Your Honors, support for people with oral and head and neck cancer produced that amicus brief, set out the grim reality in detail. People with severe life-threatening problems are being denied coverage because the procedure takes place in the mouth, rather than in some other part of the body. We've noted that affected patients, like the plaintiffs in this case, consistently have the same four factors. Each has suffered from a serious underlying non-dental medical condition. That condition has caused significant damage to teeth and gums. That damage threatens overall health. And fourth and most important, as a consequence, oral procedures are prescribed as part of a treatment plan, and it's carrying out that treatment plan, which we believe people should be allowed to do and which Medicare should cover. Despite these aggravating circumstances, however, the Secretary has repeatedly denied coverage, as she did to the plaintiffs in this case. You can be certain that if another part of the body were involved, for instance, if it was surgery to a foot due to a diabetic wound, there would be coverage for the prescribed surgery under the treatment plan. But no coverage is permitted, as a general rule, when the procedure is in the mouth. Do you think the statutory language is ambiguous? Yes, I do, Your Honor. I think the language and its context are both ambiguous. So doesn't that raise the problem of Chevron deference, given the ambiguity in the statute? It raises the question of deference, Your Honor, but Chevron deference is not appropriate in this context. Because? Because this is not a case where the Secretary has interpreted the statute through notice and comment rulemaking. Instead, all the interpretations have been in the manual and in the guidance letters. And why does that make a difference? Okay, you're telling me. You're going to tell me why that makes a difference. In the Supreme Court's 2001 decision of the United States v. Meade Corporation, the Court set out very clearly that when there's a lack of notice and comment rulemaking or a lack of formal adjudication, Chevron deference is not important. Instead of Chevron deference, we go to a different concept, and that's something that this Court has called the Skidmore assessment. And Skidmore assessment, based on a 1945 decision called Skidmore, does not really use deference. Instead, the Court has to determine whether the agency's policy or interpretation has the power to persuade. And in this case, we would say it definitely does not have the power to persuade. It's not really deference. It's deciding whether the agency has demonstrated that its interpretation has the power to persuade. And here, the rules that the Secretary has come up with are internally inconsistent, and they run contrary to the intent of Congress. And I want to get to that, to the intent of Congress, if I could right now. We believe that the statute generally, as you've asked and as I've answered, is ambiguous. The dental exclusion subsection, exclusion for coverage, occurs as part of 42 U.S.C. section 1395YA. It's subsection YA12. And that subsection refers to dental work. It would generally be considered routine. I acknowledge that the word routine does not appear in that subsection, but that subsection occurs in a part of the section, section YA, that refers repeatedly to routine or cosmetic care, such as, quote, routine physical checkups, eyeglasses or eye examinations, end quote, quote, orthopedic shoes, end quote, quote, cosmetic surgery, end quote. So the dental exclusion, dental coverage exclusion subsection occurs in the middle of all these provisions, which clearly deal with essentially routine care. But the Secretary has taken this exclusion of coverage for routine dental care and extended it to such an extent that even the most complex surgery undertaken to prevent, to preserve health and prevent deterioration, if it's in the mouth, is not covered. And that's the key thing. If this happens in the mouth, it's essentially not covered. Any of these kinds of procedures or surgeries that took place on virtually any other part of the body would be covered. But the Secretary has extended the routine dental care exclusion to cover virtually every situation. Kennedy. Scalia. Well, isn't it true that in the medical profession generally, if a primary care physician finds out that the patient has something in the mouth, the receptionist will say, we can't do anything about that. You have to go see a dentist. Well, generally speaking, a dentist would handle it. But the question is whether the dentist's actions, the procedure or surgery that the dentist carries out, Judge Goldman, whether that action would be covered. And we're saying that the Secretary has overinterpreted the routine dental exclusion routine dental coverage exclusion rule. What do we look to determine the meaning of routine dental care? Judge, we look to the legislative history of the Medicare statute in 1965. I think that's the place where it's most clearly stated. We don't look to the ordinary language. I'm sorry. I just thought that the statute did not have the word routine in it. That's correct. The dental exclusion provision itself, Judge Gould, does not have the word routine. But the legislative history does use the word routine, and it uses it repeatedly, both in 1965 and then in a later amendment in 1980. And I'd like to speak to that, if I could, very quickly. The Senate report which came out with the statute in 1975 talked about this dental exclusion, dental coverage exclusion section, section A12, as a, quote, specific exclusion of routine dental care, end quote, and was intended, quote, to make clear that the services of dental surgeons covered under the bill are restricted to, quote, complex surgical procedures, end quote. So there are two points to be derived from what the language of the legislative report said. One, the exclusion was intended to be only for routine care. And, two, it was definitely intended to cover complex surgical procedures. That was not supposed to be excluded from coverage. That legislative history ---- Who draws the line between complex and non-complex surgical? Some of these surgical procedures run into many thousands of dollars in the dental chair, and they're not ---- I don't think the dentists even call those routine. But who draws the line? Well, that's a difficult question, Judge Goodwin. I think the point we're trying to make is that the line the Secretary has drawn is clearly wrong, because it covers virtually all complex surgical procedures and would exclude them. We think the line we can come up with some parameters to provide a different line which makes more sense. Congress intended to exclude dental work generally from Medicare. Somebody had to draw the line. Well, Congress ---- And they gave it to the Secretary, didn't they? Yes. Congress gave it to the Secretary to interpret the statute. But what we're saying is that the statute as written does not exclude coverage for complex surgical procedures, and the legislative history specifically says that it was intended to cover complex surgical procedures. And what we're saying is the Secretary has drawn the line, and in such an irrational way, that inevitably it excludes coverage for most complex surgical procedures. So, but if you're hospitalized while you have those complex dental procedures, they are covered. The procedures themselves are not necessarily covered. The hospitalization is covered. So the procedures that you get, what I call the complex surgical procedures, what Congress was referring to, might or might not be covered depending upon whether you meet one of the exceptions that the Secretary has carved out through her manuals and guidance letters. There's another aspect of this which we think is ---- The exceptions would cover, for example, if the same dentist who does these procedures did some other work at the same time that was covered. Yes, Judge Gould. There is the same dentist, same time rule. That's the main exception that the Secretary has come up with to the general rule which precludes coverage for complex surgery. Honing in on that for a moment, you know, how can we say that the Secretary's interpretation of the statute to come up with that is not persuasive or shouldn't be accepted? I mean, maybe we can. What's your best point? Or do you have a case that would suggest that that's not a rational interpretation of the statute? I have two responses to that, Judge Gould. First off, no deference to the Secretary on this. And that's repeating the point I made earlier that we do not have Chevron deference in this situation because there's been no notice and comment rulemaking creating these various exceptions. Secondly, the same time, same dentist rule has a number of problems with it. First off, it means that if the excluded service is a primary procedure, it can't be covered regardless of its complexity or difficulty. That runs directly contrary to the legislative history, which says that complex surgical procedures should be covered. Secondly, the same time, same dentist test focuses on the timing of the procedure and who performs it, not on the nature of the procedure and the condition of the patient. Nothing in the statute supports the severe limitation on coverage or distinguishes between complex procedures performed as either primary or secondary. Thirdly, the same time, same dentist rule simply makes no sense. For one thing, it's often impossible for a dentist to have them performed at the same time or the same dentist. The first surgery may need time to heal. It may take several weeks for the first surgery to heal, so it can't be in many instances performed at the same time. Secondly, remember, we're talking about people who are, by definition, elderly and disabled. It may be inadvisable to do both the primary and secondary procedure at the same time. It's such a strict rule, the same time, same dentist rule, and so narrow that we find that adjudicators and courts often don't adhere to it and end up bending the rules. That happened at least twice in the various cases we cited here. The Maggio case, which is cited in the briefs, there was no same time or same dentist involved there. The district judge essentially bent the rule and determined that that person would be found covered. One of the name plaintiffs in this case, the original name plaintiff is Mr. Fournier, in his second ALJ decision, which ultimately resulted in him being, his case being found moot by the district court, he had a tooth extraction. It was the only procedure, but the tooth extraction was found by the ALJ, the administrative law judge, to be covered because it was creating such a severe infection that it was affecting his health. And that's a good example of how arbitrary the same time, same dentist rule is because what it results is in some people getting covered, if they have a sympathetic ALJ or judge, and some people not being covered, as happened with the other name plaintiffs in this case and with the other individuals whose cases have been cited in the briefs. I wonder if I could, I've got a minute left, I wonder if I could... You want to reserve some time? Sure. Thank you. May it please the Court. I'm Elizabeth Sushmasoni for Catherine Sebelius. 42 U.S.C. 1395yA12 is a very broad exclusion of benefits. It provides that no payment may be made for services in connection with the care, treatment, filling, removal or replacement of teeth or structures directly supporting the teeth. Now, notice, it's not simply no payment may be made for the care, treatment, filling, et cetera. It's no payment may be made for services in connection with, which makes the exclusion even more broad. Well, it makes it ambiguous. I'm sorry? It makes it ambiguous because what is in connection with? You can read it narrowly or you can read it broadly. It means that even those with a connection to the care and treatment, Your Honor, would be excluded from payment. Now, why would Congress choose such language? It did so because in 1965, when Medicare was enacted and when this provision was enacted, Medicare was based on private insurance. It was modeled on it. And private insurance did not provide payment for reimbursement for dental services, just as it did not provide reimbursement for eye exams, chiropractic, cosmetic surgery and a host of other types of services. And as I said, Congress modeled Medicare on private insurance. The idea was that if people wanted dental benefits, they would buy supplemental insurance. And that's actually what continues to be the case in Medicare. People can buy Medigap coverage. Now, what the Secretary has done is had to interpret this very powerful language in the context of the rest of Medicare. So particularly with regard to provisions such as 1395XS2A, which provides that there will be Part B reimbursement for outpatient services that are furnished as an incident to a physician's professional service. So the idea was always, on Congress's part, that if there was a covered procedure, then other services that were part of that covered procedure would be reimbursed as part of the what we call the primary covered procedure. So the Secretary has had to interpret 1395YA12 in order first to honor Congress's clear intention to exclude dental services, but at the same time to ensure that for those services for which Congress intended coverage, those it designated as covered procedures, that those would be fully treated. Now, the plaintiffs have said that this exclusion is limited to routine dental care. But in 1395YA, which contains a number of these different exclusions, when Congress intended to limit its exclusion to the routine, it said that expressly in the statute. It did not do so here. It's much more likely that in legislative history, when it used the phrase routine dental services, it was using it as a shorthand, you know, for what we understand, fillings, bridge work, fluoride treatments, crowns. These are what the plaintiffs are seeking reimbursement for in this case, but what most dentists would refer to as the bread and butter of their practice. It may be expensive. Sometimes it may even be complicated. But that's what dentists do. So what could Congress have meant to cover? What was left for dentists and dental surgeons to do that would be reimbursed under the statute? And we can get an idea of that if we look at Medicare as it was initially enacted. At the time, the statute defined physician to include dentists and dental surgeons specifically for the purpose of what we might call traumatic injury, catastrophic injury to the face, jaw fractures, fractures of facial bones, dislocated jaws, surgery on the jaw, or any contiguous structure. And, in fact, the statute defined physician to include dentists and dental surgeons while they were doing those things, surgery on the jaw, reducing fractures of the jaw. So we can get a good idea of what Congress actually thought would be covered. Now, that's a pretty narrow slice of medical services. Counsel, Judge Gould, if I could ask you a question, please, on that. How do you answer the argument by the appellant that to say that the services have to be done at the same time by the same dentist sort of lacks rationality because you could have some patients where their health wouldn't permit them to have the two procedures at the same time and they need a gap of time? Your Honor, it was never intended by Congress that the vast range of dental services would be covered. I mean, my point is Congress intended to cover very, very little. It was drawing distinctions here between, you know, medical procedures that would be covered, medical procedures, and procedures that would not. And in terms of things that had to do with the mouth and the jaw, it intended to cover very little. So when you ask if the Secretary's interpretation, you know, is rational or, let's say, reasonable. Or persuasive. Or persuasive. What the Secretary has had to do is reconcile these different parts of the statute. So it uses this analysis of you look to whether the procedures are the dental procedure or, let's say, the procedure involving the mouth is incident to and an integral part of a covered procedure. And if it is, if it should be, that's a way of ‑‑ if it is, then it's reimbursable. So then you have to decide how do you determine whether the dental service is incident to and an integral part of the covered service. And that's the test that the Secretary has devised, same time, same dentist. Now, that is simply a way of determining is it closely enough related, is it so important to the performance of the covered service that it makes sense to reimburse them as part of the covered service. Not separately. It is reimbursed as part of the covered service. It can't be reimbursed separately because Congress has forbidden that in 1395 A.Y.A.12. Now, there may be other ways of determining what's incident to and an integral part of. But that, the fact that there might be other tests does not make the Secretary's test unreasonable. It just means that there are other tests. So that brings me, Your Honor. In terms of whether it's persuasive under Skidmore, let me try a little thought experiment. Let's say that a dentist starts a procedure. They're planning to do, take some teeth out and reconstruct a jaw. And they get through part of the procedure and that dentist is sick or something and doesn't feel that dentist can continue to the end of the second procedure. So they bring a different dentist in. As I understand it, if the dentist, like the dentist horses changed in midstream, they would not have coverage. But if one dentist works straight through, they would. Is that right? Well, Your Honor, taking your hypothetical view as you have stated it, if it is simply removal of the teeth or reconstruction of the jaw for some purpose other than a covered procedure under Medicare, it wouldn't matter. It wouldn't be covered whether one dentist or two dentists or three dentists did it. There has to be, you know, the plaintiffs have talked a lot about conditions, medical conditions. But Medicare doesn't cover conditions. It covers specific covered procedures that Congress has said will be reimbursed, right? And the problem for the plaintiffs here is they have never identified a specific covered procedure to which their – the dental services that they want are connected. Now, this brings me, Your Honor, to the Chevron deference point. The plaintiffs believe that no deference should be accorded the Secretary because the Secretary's interpretation is set out in a policy manual. In fact, the Supreme Court has said, both in Mead and more recently and at much greater length in Barnhart v. Walton, that the fact that the Secretary's policy is not set out through notice in a regulation, through notice and comment rulemaking, is not enough to say that we will therefore not give Chevron deference. You look at a number of different factors, and one of those factors is the agency's level of expertise. Another factor is how important is this issue to the agency's administration of the statute? Another is, has the agency given very long and careful consideration to this question over a lengthy period of time? And the answer, you know, is definitely yes, because this is a question – this is an issue that goes back to 1967. That was the first interpretive letter that the Secretary put out. It was immediately then put into the manual. Congress has revisited this particular provision several times, tinkered around the edges, made slight changes, but never in a way that has called into question the validity of the Secretary's interpretation. It is also significant that two other appellate courts have looked at this exact provision and have concluded that the Secretary's interpretation is reasonable and that they have then upheld the Secretary's denial of benefits on facts very similar to this case under the substantial evidence standard. Now, if the Court would like, I would address very briefly the equal protection arguments and the exhaustion of remedies points, if you have no further questions on the – They're covered in the briefs. Yes, they are, Your Honor. If the Court has no further questions, we would ask the Court to affirm the decision of the district court. Thank you. Thank you. Your Honor, with respect to the point that other appellate courts, two other appellate courts, have approved the Secretary's policy, I would point out that both of those which they should not have been using in – well, I think one of them was acting before the Mead case came out, so they would have had no way to know that that was inappropriate. But both of them, if you use the standard we should be using, Skidmore assessment, there would be no Chevron deference. Secondly, I'd like to point to another reason why we think this provision, as the Secretary has it now, is wrong, and that is that contemporaneous with the passage of 1966, which specifically said the coverage exclusion was only for, quote, routine dental services, and only later, eight years later, with no explanation and no warning, did they take the word routine out of the regulation. So at the time of the passage of the statute, the Secretary believed it was limited, as the legislative history said, to routine dental services. By taking routine out of the regulation, the Secretary opened up the opportunity to make this a much broader exclusion than Congress intended and that had originally been there. One – am I over? No, please be. Okay, one more point. And that is – Judge Goodwin raised this earlier, and that is the question of how you draw the line, and we suggest that the line here is far too – far too much on one side. But we think there is a way to carry out congressional intent, which is what we think is the key to this case. And that's by recovering coverage of complex surgical procedures, which is a language from the legislative history, in the mouth, that are part of a treatment plan to avoid further deterioration caused by the serious underlying non-dental medical condition. In other words, it takes it back to look at what caused this problem to begin with. It recognizes a problem has been created in the mouth, which is going to cause additional health problems for this individual unless it's treated. So we are – Which would be covered or are covered? Excuse me? The other – The other condition. The underlying medical condition would be covered, as it was in this case. For instance, Mrs. Berg had Sogren's syndrome, and as she pointed out in her ALJ hearing, every aspect of that that she had which affected her eyes, her face, and other parts of her body were covered, but it wasn't covered in the mouth because of the dental exclusion. So we're saying if you connect – if you connect this dental problem, this problem in the mouth to the underlying medical condition and try to correct that, that that's a legitimate way to carry this out and to draw the line, whereas the same-time, same-dentist rule just makes no sense and doesn't carry out the intent of Congress. How does – what is your response to the government's argument that they have met the level of promulgation of regulations to – to invoke Chevron deference as opposed to – Oh, the government – oh, excuse me. They cite – yeah, as opposed to Skidmore when they cited a particular case? Well, the government, Judge Wardlaw, cited the Barnhart case, but they never cited it in the briefs. They're bringing that up for the first time now. I've read Barnhart in years past. I honestly can't say off the top of my head whether the way the government has described it is accurate or not. But I do know the court, the Supreme Court, has generally drawn a big distinction between notice-and-comment rulemaking and manuals in the EADS case. Well, I know what EADS says, that if the agency has been delegated rulemaking authority by Congress, then you would go to Chevron. The second step of that is that there has to be rulemaking, not just the delegation of rulemaking, but there has to be notice-and-comment rulemaking, not just the publication unilaterally of manuals or guidance letters. That's the difference here. There has been no rulemaking which has created all these exceptions and exceptions to exceptions. There's no rulemaking here, despite the fact the Secretary was delegated to do it. If the Secretary were to promulgate regulations with notice-and-comment rulemaking, theoretically it might be able to pass some of these exceptions, but there would be an opportunity for the public to say, that makes no sense, that doesn't carry out the intent of Congress. That's never happened here. Okay. Anyone have any further questions? Thank you, Your Honor. Thank you very much. Thank you. Byrd v. Sebelius will be submitted.
judges: Goodwin, Wardlaw, Gould